UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| E.G., by and through his Next Friends, his Parents, A.G. and J.G., | ) ) | |
| | ) | Civil Action No. 3:19-CV-220-CHB |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| ANCHORAGE INDEPENDENT BOARD OF EDUCATION, | ) ) ) | |
| Defendant, | ) ) | **MEMORANDUM OPINION AND ORDER** |
| v. | ) ) ) | |
| KENTUCKY DEPT. OF EDUCATION OFFICE OF SPECIAL EDUCATION AND EARLY LEARNING and GRETTA HYLTON, in her official capacity as Director of the Office of Special Education and Early Learning, | ) ) ) ) ) ) | |
| Third-Party Defendants. | ) ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on Defendant's Answer, Counterclaim, and Third-Party Complaint, [R. 4] in which Defendant appeals an administrative decision rendered by the Exceptional Children's Appeals Board ("ECAB") on March 8, 2019 in Kentucky Department of Education ("KDE") Agency Case No. 1718-10.  The parties appeared before United States Magistrate Judge Regina S. Edwards on June 3, 2019, advised that discovery was unnecessary, and submitted a briefing schedule. [R. 13]  Pursuant to that schedule, Defendant filed its brief in support of its position, [R. 15], Plaintiff responded, [R. 21], and Defendant replied to Plaintiff's

response [R. 23].[1] The matter is now fully briefed and ripe for review. The Court rules as follows.

## I.    BACKGROUND

### A.  The Student

E.G., now twenty years-old, was diagnosed with autism at the age of twenty months.[2] [R. 14-2, p. 8 (Transcript, April 17, 2018)] He has an IQ of 59, and his educational needs are significant. [R. 14-6, p. 254 (Integrated Assessment Report)] He has severe communication issues, including severe impairment of his expressive language, receptive language, and speech-sound production. *Id.* at pp. 6–8; R. 14-7, pp. 465–67 (July 21, 2017 IEP).  He is minimally verbal and cannot engage in conversation. [R. 14-7, p. 465] Instead, he usually communicates in single words or short phrases, primarily nouns and verbs. *Id.*; R. 14-2, p. 70. He does not model speech from his peers, and as a result, he needs one-on-one speech services. [R. 14-7, p. 465] E.G. also has difficulty with reading comprehension; his reading comprehension is poor compared to his ability to read text. *Id.* at 468. He has significant sensory and motor coordination issues, as well. He engages in physical stereotypy by flapping his hands and running his fingers across his body, and he engages in vocal stereotypy by periodically reciting a string of unrelated words. [R. 14-2, pp. 11–12; R. 14-3, p. 22] If he hears loud or unexpected noises (e.g., a dropped book or a slammed door), he may have an outburst or engage in maladaptive behaviors

---

[1] Third-Party Defendants filed an Answer to the Third-Party Complaint, [R. 7], but they have not filed briefs in this matter. Defendants state in their Answer, Counterclaim, and Third-Party Complaint that the Third-Party Defendants are "not called upon to answer the substance of the Complaint but [have] been named as [parties] in order to give full effect to any final order or judgment of this Court and to make such order or judgment binding on" Third-Party Defendants. [R. 4, ¶¶ 4–5] The Magistrate Judge's scheduling order did not require the Third-Party Defendants to submit briefs [R. 13].

[2] Both the Hearing Officer and the ECAB state that E.G. was diagnosed with autism at the age of eighteen months. [R. 1-2, p. 7; R. 1-3, p. 8]. At the due process hearing, E.G.'s mother testified that he received his "official diagnosis of autism at 20 months of age." [R.  14-2, p. 29].

(e.g., scratching, grabbing eyeglasses, pushing over furniture). [R. 14-7, p. 472–73]. As a result, he wears noise canceling headphones to prevent such outbursts. *Id.* E.G's social skills are also delayed; he does not relate to his peers or model his peers' behavior. *Id.* He also struggles to complete tasks without prompts. *Id.* at 471.

The parties do not dispute that, under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, et seq., E.G. is an individual with a disability who needs special education and related services. *See* 20 U.S.C. § 1401(3)(A) (defining "child with a disability"). Nor do the parties dispute that Anchorage Independent Schools ("Anchorage" or the "School District"),[3] an independent school district within the Commonwealth of Kentucky, is the Local Educational Agency ("LEA") responsible for providing E.G. with a free appropriate public education, or "FAPE." *See* 20 U.S.C. § 1401(9) (defining FAPE); *id.* § 1401(19) (defining LEA); R. 14-3, p. 36. FAPE includes special education and related services that "are provided in conformity with the individualized education program required under section 1414(d)" of the IDEA. *Id.* § 1401(9). The individualized education program ("IEP"), discussed in more detail below, is best summarized as "a requisite planning document with goals and objectives based on [the student's] past and expected performance." *L.H. v. Hamilton Cnty Dept. of Edu.*, 900 F.3d 779, 785 (6th Cir. 2018). It "must state the student's educational status, the annual goals for the student's education, the special-educational services and aides to be provided to meet those goals, and the extent the student will be 'mainstreamed,' i.e., spend time in school environments with non-disabled students." *Id.* at 788 (citing 20 U.S.C. § 1414(d)(1)(A)).

### B.  The Student's Education at Anchorage School

---

[3] Anchorage Independent Schools, by and through the Anchorage Independent Board of Education, is the school district responsible for providing FAPE to E.G. Anchorage School is the school that E.G. attended from kindergarten through eighth grade. For clarity, the Court refers to Anchorage Independent Schools as "Anchorage" or the "School District" and refers to Anchorage School by its full name.

When E.G. was three years old, he began receiving special education services at Carriage House, a private pre-school for autistic children. [R. 14-2, pp. 10] This private pre-school was funded by the School District. *Id.* From kindergarten through eighth grade, E.G. attended Anchorage School. *Id.*

During his time at Anchorage School, E.G. was placed in part-time general education and part-time special education classrooms. [R. 14-3, p. 35 (Transcript, April 18, 2018)] For example, he received some instruction in the areas of science and social studies in general education classes, which were modified to fit his needs. *Id.* He also participated in electives with regular education students for approximately one hour each day. *Id.* He participated in school assemblies, as well. *Id.*

E.G. received Applied Behavior Analysis ("ABA") therapy both at Anchorage School and in home-based therapy programs. [R. 14-2, p. 9–10]. E.G.'s mother described ABA therapy as "a very systemic delivery of teaching children not just language but language academics, functional living skills, self-help skills . . . delivered in a very structured, controlled environment with high . . . use of reinforcers." [R. 14-2, p. 9] It has also been described as "a systemic approach using principals of science from behavior and learning to make socially significant behavior changes . . . that can be [used] to increase behaviors or decrease behaviors." [R. 14-3, p. 3] One of Anchorage's ABA programs, STRIVE, was developed by E.G.'s mother and Anchorage School staff members. [R. 14-2, pp. 10–11] The program provides ABA therapy for low-incidence students, e.g., those with autism or Down Syndrome. *Id.* at 10. E.G. participated in the STRIVE program while at Anchorage School. *Id.*

### C. The 2015 Placement Process and Development of the July 2015 IEP

Anchorage School only provides services through eighth grade. *Id.* at 12; R. 14-3. p. 18.

However, during the relevant time period, Anchorage contracted with two other school districts,

Oldham County and Jefferson County Public Schools ("JCPS"), for high school services. [R. 14-2, p. 12; R. 14-3, p. 18] When an Anchorage student graduated from the eighth grade, he or she

was transferred to one of the contracting school districts to complete his or her high school

education. [R. 14-3, p. 18]

In 2015, E.G. completed his eighth-grade year at Anchorage School.[4] [R. 14-2, p. 12]

Because the School District does not provide services beyond the eighth grade, E.G. would

typically be placed at one of the two contracting school districts, Oldham County or JCPS.

Oldham County did not have any space available in its school district, but JCPS had three

potential school sites with space available for E.G. *Id.* at 13. His parents ("Parents") toured a

classroom at Jeffersontown High School but were disappointed by conditions they felt were

"disturbing" and an environment they described as "chaotic." *Id.* For example, they saw students

wandering around and one student asleep in his chair, "out cold sitting up." *Id.*

The Parents then contacted the School District and requested that E.G. be placed at the

Bluegrass Center for Autism ("BCA"). *Id.* Parents describe BCA as a "non-profit organization

which provides specialized programming for individuals with autism." [R. 21, p. 6] The

Anchorage Independent Board of Education ("Board") ultimately voted against placing E.G. at

BCA in July 2015. [R. 14-2, p. 14.] E.G.'s mother testified that, when asked for a reason for

denying the placement at BCA, the Board would not provide an answer. *Id.*

After the Board denied Parents' placement request, the School District held an

Admissions and Release Commission ("ARC") meeting to review E.G.'s IEP and determine

---

[4] E.G.'s mother testified that they "kept him an extra year" at Anchorage School, apparently to repeat his eighth-grade year before transitioning to a high school setting. [R. 14-2, p. 12]

which school he should attend.  *Id*. An IEP (the "July 2015 IEP") was ultimately developed for a

placement with JCPS for the upcoming school year. *Id.* at 14.  However, after the ARC meeting,

the Parents informed the School District that E.G.'s most recent IEP (dated March 30, 2015) had

not been used to develop the July 2015 IEP. *Id.* at 15. Instead, the July 2015 IEP relied on an

outdated IEP, dated January 16, 2015.  *Id.*

On August 24, 2015, Parents requested that the School District host an ARC meeting

without JCPS personnel present. *Id.*; *see also* R. 14-3, p. 37. The School District did not do so,

but it did offer to hold another ARC meeting (with JCPS personnel) to correct the IEP and to

hold a private meeting (without JCPS personnel). [R. 14-3, pp. 36–37] Parents declined the offer

and enrolled E.G. in BCA in the fall of 2015. [R. 14-2, p. 15]

### D.  The 2016 Due Process Hearing and ECAB Decision in Agency Case No. 1516-17[5]

Under 20 U.S.C. § 1415(f) and 707 KAR 1:180, the aggrieved parents may file a "due

process complaint" and have a due process hearing.  E.G.'s parents filed a request for a due

process hearing on January 16, 2016. [R. 8-2, p. 2, 3:16-cv-804-TBR] The hearing took place on

March 29–31, 2016 before Hearing Officer Paul L. Whalen. *Id.* The Hearing Officer rendered his

decision on July 5, 2016. *Id.* He first found that the School District was not required to give

written notice of its refusal to change E.G.'s placement to BCA. *Id.* at 18–21. He also found that

the IEP developed for E.G.'s 2015–2016 school year provided FAPE, and the Parents failed to

demonstrate that JCPS could not provide FAPE to E.G. *Id.* at 22–29. As a result, the Hearing

---

[5] The ECAB's decision in Agency Case No. 1516-17 is not before this Court for review. However, both parties have cited to the decisions in that case. Accordingly, to ensure a comprehensive understanding of the background of the present case, the Court has reviewed the Hearing Officer's and ECAB's decision in Agency Case No. 1516-17, which is on record in the related Western District of Kentucky case, Case No. 3:16-cv-804, discussed below.

Officer found that the Parents were not entitled to tuition reimbursement. *Id.* at 29–30. The Parents appealed.

On November 14, 2016, the ECAB issued its decision. [R. 8-1, 3:16-cv-804-TBR] The ECAB found that Anchorage Independent Schools was not obligated to consider a private placement for E.G. unless it was unable to provide FAPE through the contracting public schools. *Id.* at 3.  It also found that the ARC meetings at issue in that case had been properly constituted, and the school had no duty to provide written notice of a placement (or refusal to change a placement). *Id.* at 3–4. The ECAB did not make a finding as to whether the School District had provided FAPE, however, because it found that the IEP development process had not been completed. *Id.* at 6–11. More specifically, it found that another ARC meeting should be held in which the ARC could consider the most recent IEPs and evaluations of E.G. *Id.* at 11. The ECAB therefore remanded the matter for purposes of conducting another ARC meeting for completion of the IEP. *Id.* at 20. The ECAB did explain that, if JCPS could not implement the IEP, BCA would be an appropriate placement for E.G. *Id.* at 12–19.

### E.  The Appeal to the United States District Court for the Western District of Kentucky (Case No. 3:16-cv-804)

On December 14, 2016, prior to the recommended ARC meeting, the Parents filed an appeal of the ECAB's ruling with the United States District Court for the Western District of Kentucky in Case No. 3:16-cv-804-TBR. [R. 1, 3:16-cv-804-TBR] In their complaint, they sought reversal of certain portions of the ECAB's decision, reasonable attorneys' fees and costs, reimbursement for tuition for the 2015–2016 and 2016–2017 school years, and an award of future tuition for the remainder of E.G.'s high school education. *Id.*; *see also* R. 6, 3:16-cv-804-TBR (Amended Complaint). Anchorage moved to dismiss for lack of subject matter jurisdiction and for a judgment on the pleadings. [R. 22, 3:16-cv-804-TBR] Specifically, Anchorage argued

that the Parents failed to exhaust their administrative remedies because the ECAB remanded the matter for the completion of an ARC meeting and development of an IEP. *Id.* at 7–12.

The Court agreed. On October 11, 2017, the Court dismissed the matter without prejudice. [R. 31, 32, 3:16-cv-804-TBR] It held that the Parents failed to exhaust their administrative remedies and had not shown that resort to the administrative process would be futile or inadequate. [R. 31]

### F.  The 2017 IEP Development Process

While the appeal was pending in federal court, the Parents attended multiple meetings with the School District. *See e.g.*, [R. 14-2, p. 47] On January 20, 2017, the Parents attended an ARC meeting to discuss E.G.'s transition to JCPS. [R. 14-3, p. 37; R. 14-6, p. 10] Representatives from both Anchorage Independent Schools and JCPS attended. [R. 14-3, p. 37] At that point, E.G. had not been in public school for over a year, so the parties decided that E.G. would need to be evaluated before an IEP could be developed. *Id.* at 39. Roughly a week later, on January 26, 2017—before any evaluations had taken place—a second ARC meeting was held and JCPS presented Parents with a draft IEP for E.G.  [R. 14-2, p. 24; R. 14-6, pp. 201–19] Parents did not accept that IEP, noting their concerns that the suggested evaluations had not been completed. [R. 14-2, p. 24; R. 14-6, p. 59]

Over the next three months, E.G. was evaluated and observed at BCA by JCPS personnel. *See, e.g.*, R. 14-2, p. 24. On April 20, 2017, another ARC meeting was held. [R. 14-6, pp. 295–461 (ARC Meeting Transcript)] Additional ARC meetings were held on May 23, 2017, June 27, 2017, and July 21, 2017 [R. 14-7, pp. 37–305; 380–451; 489–718 (ARC Meeting Transcripts)] On July 21, 2017, the School District provided the proposed IEP at issue in this case. [R. 14-7, pp. 465–488]

### G.  The July 21, 2017 IEP

The first several pages of the July 21, 2017 IEP focus on E.G.'s "Present Level of Academic Achievement and Functional Performance." *Id.* at 465–476.  The IEP then discusses his "Transition Services Needs" and his "Postsecondary Goal(s)." *Id.* at pp. 476–477. E.G's post-secondary goals include the completion of employment training "to be able to work in a supported employment position in his area of interest (2/21/17 music/dance, parts assembly)," and participation "in a supported living arrangement (2/21/17 with family) and perform daily living skills activities (e.g., personal shopping, meal preparation, chores) to the highest degree of independence possible." *Id.* at 477.

The IEP also lists the following "Measurable Annual Goals and Benchmarks":

- Goal #1: "Given a real world math task and asked to solve, [E.G.] will demonstrate basic money handling skills (i.e., staying within a set budget, choosing the better buy, making a purchase) by completing the task with at least 80% accuracy across 3 consecutive instructional sessions, as measured by teacher data probes." *Id.* at 479.

- Goal #2: "Given an analogue or digital clock and a schedule, [E.G.] will demonstrate basic time telling concepts (i.e., tell time on a digital clock to the minute, tell time to the quarter hour/half hour/hour on an analogue clock, and independently follow a schedule), with at least 80% accuracy across 3 consecutive instructional sessions, as measured by teacher data probes." *Id.* at 480.

- Goal #3: "[E.G.] will demonstrate functional reading skills by increasing his sight word vocabulary and basic reading comprehension with at least 90% accuracy across 3 consecutive instructional sessions, as measured by teacher data probes." *Id.* at 481.

- Goal #4: "Given a functional writing task (i.e., write personal information from a model, type 3 to 5 sentences on a topic of interest, and compose a shopping list) and asked to complete, [E.G.] will produce the writing task with at least 80% accuracy (fewer than 20% errors), across 3 consecutive instructional opportunities, as measured by student work samples." *Id.*

- Goal #5: "Given the opportunity to advocate for himself, [E.G.] will independently request help or state his needs to a peer or adult for 4 out of 5 opportunities across 3 consecutive sessions, as measured by teacher data probes." *Id.* at 482.

- Goal #6: "[E.G.] will follow a task analysis to complete a variety of functional tasks to increase independence with at least 80% accuracy across 3 consecutive instructional sessions, as measured by teacher data probes." *Id.* at 483.

- Goal #7: "During structured language tasks and conversational exchange, [E.G.] will use intelligible speech (appropriate volume and correct speech-sound production) to request help as needed, initiate conversation with a partner, and use higher-level sentence structures to describe familiar objections by stating their feature, function and/or class with 80% accuracy across three consecutive sessions as measured by service log data and teacher report." *Id.*

- Goal #8: "Given vocabular language tasks, [E.G.] will demonstrate knowledge of receptive and expressive components with 80% accuracy over 3 consecutive sessions as measured by data collected during drill and practice sessions." *Id.* at 484.

For each of these goals, the IEP lists methods of measurement for that goal, the specially designated instruction that will be utilized, which postsecondary goal the annual goal is designed to address, and benchmarks/short-term instructional objectives. For example, for Goal #8, the

first benchmark or short-term instructional objective states, "Given vocabulary language tasks, [E.G.] will demonstrate knowledge of prepositions with 80% independence over 3 consecutive sessions." *Id.*  The fifth benchmark or short-term instructional objective provides, "Given vocabulary language tasks, [E.G.] will state or use the correct prepositions with 80% independence over 3 consecutive sessions." *Id.* The second and sixth Benchmark or Short-Term instructional Objective for Goal #8 sets a similar goal for pronouns. *Id.*

The IEP also explains the types of "related services" E.G. will receive. *Id.* at 488. For example, the IEP provided for four thirty-minute sessions of occupational therapy a month and four thirty-minute sessions of speech/language therapy a month. *Id.* at 488. In another section of the IEP, it explained that "Speech Language Services will be individual one to one as a prescribed related service through the first 9 weeks of school or to the first school based JCPS ARC meeting to discuss transition and progress." *Id.* at 487.

### H.  The 2018 Due Process Hearing and 2019 ECAB Decision in Agency Case No. 1718-10

The Parents emailed Anchorage's Special Education Director on July 24, 2017 and declined the proposed July 21, 2017 IEP. [R. 14-6, p. 162] They explained that they "decline[d] the offered services at Jefferson County Public School System." *Id.*

On December 4, 2017, the Parents filed a request for a due process hearing. [R. 14-1, p. 8–13] That hearing was held on April 17–20, 2018 before Hearing Officer Whalen. The Hearing Officer rendered his decision on September 3, 2018. [R. 1-2] The specific issues before the Hearing Officer were: (1) whether the July 21, 2017 IEP had been developed in accordance with the ECAB's decision in Agency Case No. 1516-17; (2) whether E.G. was being offered FAPE for the 2017–2018 school year; and (3) whether the IEP can be implemented by the School District's contractor, JCPS. *Id.* at 4.

The Hearing Officer found that the July 21, 2017 IEP had been developed in accordance with the ECAB's decision with two exceptions. First, the Hearing Officer found that, given E.G.'s history of needing one-on-one speech services, "the ARC should not have limited the related [one-on-one] speech therapy to 9 weeks." *Id.* at 27. Second, the Hearing Officer found that the IEP did not adequately provide for movement breaks, despite E.G.'s evaluations indicating that he needed such breaks. *Id.* at 28. The Hearing Officer noted that the IEP did not "state[] that [E.G.] needs movement breaks and they are going to be addressed on a daily basis at intervals of 'A' etc." *Id.* The Hearing Officer therefore remanded those matters to the ARC "for correction and clarification." *Id.* at 29.

The Hearing Office next considered whether the School District provided FAPE for the 2017–2018 school year. The Hearing Officer first found that the IEP's stated goal that E.G. be able to identify prepositions and pronouns (listed as a benchmark or short-term instructional objective under Goal #8) was not reasonably calculated to help him make progress. *Id.* at 30. The Hearing Officer therefore remanded that matter to the ARC to "re-consider or re-write short-term goals which are more reasonably calculated to help him make progress." *Id.* The Hearing Officer next found that E.G. was denied FAPE because the July 21, 2017 IEP failed to consider transitional services and vocational education. *Id.* at 30–31.

The Hearing Officer found that JCPS can provide FAPE once the corrections were made to the IEP. *Id.* at 32–35. He therefore remanded the matter to the ARC to make the necessary corrections. *Id.* at 35. He also ordered Anchorage to reimburse Parents for the 2015–2016 and 2016–2017 school years and the first two months of the 2018–2019 school year. *Id.* Lastly, he explained that he lacked the authority necessary to award attorneys' fees and costs. *Id.* at 36. The School District appealed. [R. 14-2, p. 507]

- 12 -

On March 8, 2019, the ECAB issued its decision. [R. 1-3] The two issues before the ECAB were (1) whether Anchorage Independent Schools failed to provide FAPE to E.G. regarding movement breaks, one-on-one speech services, goals related to preposition and pronoun usage, and vocational and transitional needs, and (2) whether the Parents were entitled to tuition reimbursement. *Id.* at 8.

The ECAB found that there had been no denial of FAPE with regards to movement breaks and pronoun/preposition goals. *Id.* at 24–26. However, the ECAB found that there was denial of FAPE with respect to the lack of vocational training, noting that the IEP referenced vocational training and transitional programming, but it lacked specifics about the requirements and when and where E.G. would receive such training and programming. *Id.* at 26–27. The ECAB also noted that the IEP stated that "'Vocational Skills Instruction' is not available in Grade 11, but is only available from Grades 12 and beyond." *Id.* at 27. As for the proposed one-on-one speech services, the ECAB stated, that it held "reservations about the school's intent and ability to implement the speech therapy." *Id.* at 32. However, it "hesitat[ed] to find an IEP defective in its content because it provided for review after nine weeks."[6] *Id.*  The ECAB also found that E.G. was denied FAPE because JCPS could not implement the IEP due to the physical environment at the school. *Id.* at 27–33.

Lastly, the ECAB found that the Parents were entitled to reimbursement for tuition for the 2017–2018 and 2018–2019 school years but were not entitled to reimbursement for any prior years. *Id.* at 34–37. The ECAB explained that its prior decision in Agency Case No. 1516-17 did *not* include a finding that FAPE had been denied; rather, it found that the IEP process was

---

[6] One ECAB panelist dissented on the speech services issue. The panelist noted that the IEP provided for more speech therapy than E.G. was receiving at BCA. The panelist also noted that the school could reevaluate the need for such services at any time, and the IEP's nine-week review timeline was only included so the parties could determine if anything on the IEP needed to be adjusted after the first few weeks of school.

incomplete. *Id.* at 35–36. After examining the principles of res judicata and the law-of-the-case

doctrine, the ECAB found that the Parents were barred from relitigating the 2015–2016 FAPE

and reimbursement issues. *Id.* at 36–37. However, because the July 21, 2017 IEP did not provide

FAPE, the ECAB found that the Parents were entitled to tuition for the 2017–2018 and 2018–

2019 school years. *Id.* at 37. It also noted that "per the decision in the prior case, BCA is an

appropriate placement." *Id.*

## I.   The Present Suit

On March 25, 2019, Parents filed this suit on behalf of E.G. for fees and reimbursement

and future tuition [R. 1]. Parents argued that they were the prevailing party in the administrative

action (Agency Case No. 1718-10) and were therefore entitled to attorneys' fees under the IDEA.

*Id.* at 1. Defendant responded on April 2, 2019 with its Answer, Counterclaim, and Third-Party

Complaint [R. 4]. The Board denied that Parents were entitled to attorneys' fees and tuition

reimbursement. *Id.* at 4. It also asserted a Counterclaim against Parents and a Third-Party

Complaint against KDE Office of Special Education and Early Learning and its Director, Gretta

Hylton. *Id.* at 5–10. It alleged that "[t]he ECAB's March 8, 2019 Decision that [the School

District] denied E.G. FAPE is erroneous as a matter of law and is unsupported by substantial

evidence in the record." *Id.* at 10, ¶ 18. It also alleged that the ECAB's "Decision that [the

School District] must reimburse E.G. for private school tuition for school years 2017–18 and

2018–19 is erroneous as a matter of law and is unsupported by substantial evidence in the

record." *Id.* ¶ 20.

On June 3, 2019, the parties met before a magistrate judge and advised that discovery

was unnecessary [R. 13]. The magistrate judge entered an order providing a briefing schedule

and directing Third-Party Defendants to file the administrative record. That order also provides

that the Parents may file a Petition for Fees after the Court issues its decision on Defendant's

claims.[7] The magistrate judge also allowed Defendant to file a Motion to Accept Additional

Evidence, in which Defendant asked the Court to accept a copy of a July 20, 2018 IEP [R. 16].

The magistrate judge granted the motion, accepting the July 20, 2018 IEP as additional evidence

but only for proof of the existence of the document [R. 26]. The administrative record has since

been filed, [R. 14], and the matter has been fully briefed [R. 15, R.  21, R. 23].

## II.     BURDEN OF PROOF AND STANDARD OF REVIEW

As the Sixth Circuit has explained, "[t]he party challenging the IEP, typically the parents

or guardian, has the burden of proving by a preponderance of the evidence that the IEP devised

by the school is inappropriate." *L.H.*, 900 F.3d at 790 (citing *Schaffer ex rel. Schaffer v. Weast*,

546 U.S. 49, 62 (2005)). When considering whether this burden was met, the Court "applies a

'modified de novo' standard of review" to the agency's factual findings.  *L.H.*, 900 F.3d at 790

(citing *Burilovich v. Bd. of Educ. of Lincoln Consol. Schs.*, 208 F.3d 560, 565 (6th Cir. 2000)).

This modified standard of review requires the Court to "make an independent decision based on

the preponderance of the evidence while also giving 'due weight' to the determinations made by

the [ECAB]." *Id.* (citing *Bd. of Educ. of Hendrick Hudson Cent. Sch.  Dist. v. Rowley*, 458 U.S.

176, 206 (1982)).

The Sixth Circuit has explained this modified standard of review in detail:

> [T]he court "(i) shall receive the records of the administrative proceedings; (ii) shall
> hear additional evidence at the request of a party; and (iii) basing its decision on
> the preponderance of the evidence, shall grant such relief as the court determines is
> appropriate." 20 U.S.C. § 1415(i)(2)(B). The court may not "simply adopt the state
> administrative findings without an independent re-examination of the evidence,"
> *Doe v. Metro. Nashville Pub. Schs.*, 133 F.3d 384, 387 (6th Cir. 1998), but neither
> may it "substitute [its] own notions of sound educational policy for those of the

---

[7] From this order, the Court understands that any request for attorneys' fees and costs, such as that outlined in
Plaintiff's Complaint, [R. 1], will be decided at a later date if Plaintiff files a Petition for Fees.

school authorities which [it] review[s]," [*Board of Education of Hendrick Hudson Central School District, Westchester County v. Rowley*, 458 U.S. 176, 206 (1982)].

*Id.*

The weight to be given the ECAB's findings "depends on whether the finding is based on educational expertise." *Id.* (citing *McLaughlin v. Holt Public Schools Bd. of Educ.*, 320 F.3d 663, 669 (6th Cir. 2003)). "Less weight is due . . . on matters for which educational expertise is not relevant because a federal court is just as well suited to evaluate the situation[;] [m]ore weight . . . is due to . . . determinations on matters for which educational expertise is relevant." *Id.* (quoting *McLaughlin*, 320 F.3d at 669) (internal quotations marks omitted).

## III.   ANALYSIS

The IDEA provides federal funding to states to assist in educating children with disabilities. *Endrew F. v. Douglas Cty. Sch. Dist.*, 137 S.Ct. 988, 993 (2017) (citations omitted). "In exchange for the funds, a State pledges to comply with a number of statutory conditions," including the requirement that the state provide a free and adequate education, or FAPE, to eligible children. *Id.* (citing 20 U.S.C. § 1412(a)(1)). As explained above, FAPE includes special education and related services that "are provided in conformity with the individualized education program required under section 1414(d)" of the IDEA. *See* 20 U.S.C. § 1401(9) (defining FAPE). The IDEA defines the IEP as a "written statement for each child with a disability" that includes, among other things, "a statement of measurable annual goals, including academic and functional goals," as well as "a statement of the special education and related services and supplementary aids and services . . . to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child." *See id.* § 1414(d)(1)(A)(i) (defining IEP). The IEP must also provide "the projected date for the beginning of the services and modifications . . . and the anticipated frequency,

location, and duration of those services and modifications." *Id.* § 1411(d)(1)(A)(i)(VII). In sum,

an IEP is "a requisite planning document with goals and objectives based on [the student's] past

and expected performance." *L.H.*, 900 F.3d at 785. It has been described by the Supreme Court

as "the centerpiece of the [IDEA]'s education delivery system for disabled children." *See Honig*

*v. Doe*, 484 U.S. 305, 311 (1988); *see also Tennessee Dept. of Mental Health and Mental*

*Retardation v. Paul B.*, 88 F.3d 1466, 1471 ("The development and implementation of the IEP

are the cornerstones of the Act." (citing *Honig*, 484 U.S. at 311)).

The Supreme Court first addressed the IDEA's FAPE requirement in *Board of Education*

*of Hendrick Hudson Central School District, Westchester County v. Rowley*, 458 U.S. 176

(1982). In *Rowley*, the Court held that the FAPE requirement is satisfied if the child's IEP sets

out an educational program that is "reasonably calculated to enable the child to receive

educational benefits." *Id.* at 207. For children being educated in regular classrooms, this standard

required an IEP "reasonably calculated to enable the child to achieve passing marks and advance

from grade to grade." *Id.* at 204. The IEP at issue in *Rowley* met this standard. *Id.* at 202.

However, the *Rowley* Court declined "to establish any one test for determining the adequacy of

educational benefits conferred upon all children covered by" the IDEA, instead "confin[ing] its

analysis" to the facts of the case before it. *Id.*

The Supreme Court examined the standard announced in *Rowley* in *Endrew F. v.*

*Douglas County School District RE-1*, 137 S.Ct. 988 (2017). In that case, the parents of an

autistic child grew dissatisfied with the IEPs proposed by their son's public school, so they

placed him in a private school specializing in educating autistic children. *Id.* at 998–97. They

then sought reimbursement for the private school tuition. *Id.* at 997. An Administrative Law

Judge ("ALJ") found that the public school provided FAPE and denied the parents' request for

reimbursement, and the District Court agreed. *Id.* The Tenth Circuit affirmed, reciting language

from *Rowley* that the services provided to disabled children need only be calculated to provide

*some* educational benefit to the child.  *Endrew F.*, 137 S.Ct. at 997 (citation omitted). It held that

the child's IEPs met this standard. *Id.*

The Supreme Court reversed. In doing so, the Court examined its earlier decision in

*Rowley* and the Tenth's Circuit's reliance on that case. *Id.* at 998. The *Endrew F.* Court pointed

out that *Rowley* "declined to articulate an overarching standard to evaluate the adequacy of the

education provided under the [IDEA]." *Id.* at 998–99. However, "the decision and the statutory

language point to a general approach: To meet its substantive obligation under the IDEA, a

school must offer an IEP reasonably calculated to enable a child to make progress appropriate in

light of the child's circumstances." *Id.* at 999.

The Court, having articulated this standard, provided further guidance on its application:

> The "reasonably calculated" qualification reflects a recognition that crafting an
> appropriate program of education requires a prospective judgment by school
> officials. The Act contemplates that this fact-intensive exercise will be informed
> not only by the expertise of school officials, but also by the input of the child's
> parents or guardians. Any review of an IEP must appreciate that the question is
> whether the IEP is *reasonable,* not whether the court regards it as ideal.

*Id.* (internal citations omitted).

The Supreme Court acknowledged that it "describe[d] a general standard, not a formula."

*Id.* at 1000. Nevertheless, it explained,

> this standard is markedly more demanding than the "merely more than *de minimis*"
> test applied by the Tenth Circuit. It cannot be the case that the Act typically aims
> for grade-level advancement for children with disabilities who can be educated in
> the regular classroom, but is satisfied with barely more than *de minimis* progress
> for those who cannot.

*Id.* at 1000–01. "The IDEA demands more" than this *de minimus* standard. *Id.* at 1001. "It

requires an educational program reasonably calculated to enable a child to make progress

appropriate in light of the child's circumstances." *Id.* Accordingly, "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 999.

Citing the *Endrew F.* standard, the ECAB in this case considered whether Anchorage Independent Schools failed to provide FAPE to E.G. regarding movement breaks, one-on-one speech services, goals related to preposition and pronoun usage, and vocational and transitional needs. [R. 1-3] The ECAB ultimately concluded that FAPE had been denied only with respect to the lack of vocational education and transitional services, and because JCPS could not implement the IEP.  *Id.* at 26–33.

In its Counterclaim and Cross-Complaint, [R. 4], the School District argues that the ECAB's decision is erroneous as a matter of law and unsupported by substantial evidence in the record. More specifically, the School District argues that the July 21, 2017 IEP is reasonably calculated to enable E.G. to make appropriate progress in light of his circumstances, [R. 15, pp. 14–20]; the IEP appropriately addressed E.G.'s vocational and transition needs, *id.* at 20–26; it was appropriate to place E.G. in a Moderate and Severe Disabilities ("MSD") special classroom, *id.* at 27–33; and JCPS could implement the July 21, 2017 IEP, *id.* at 33–38. The School District then argues that any errors in the IEP are "procedural at best" and the parents must therefore demonstrate substantive harm to invalidate the IEP. *Id.* at 39–41. Lastly, the School District argues that the Parents are not entitled to tuition reimbursement because they cannot prove that the School District denied FAPE or that BCA is an appropriate placement. *Id.* at 42–47.

In response, the Parents argue the School District failed to provide FAPE because the IEP was not reasonably calculated to enable E.G. to make appropriate progress in light of his circumstances, specifically with respect to his vocational and transitional needs and his need for

one-on-one speech services. [R. 21, pp. 17–27] They further argue that placement in an MSD classroom was inappropriate, and even if such placement was appropriate for E.G., JCPS could not implement the IEP. *Id.* at 28–37. The Parents also address the School District's argument that the alleged errors were merely procedural. *Id.* at 39–40. Lastly, the Parents argue that they are entitled to tuition reimbursement and the Court should affirm the ECAB's tuition award. *Id.* at 41–43.

With these arguments in mind, the Court addresses the School District's argument that any alleged errors in this case were procedural in nature. The Court next considers whether the School District provided FAPE to E.G. in its July 21, 2017 IEP, specifically with respect to his vocational and transitional needs and speech services.  If the School District provided FAPE to E.G. through the July 21, 2017 IEP, the Court must next determine whether JCPS could have provided that FAPE. If JCPS could not provide FAPE to E.G., the Court must determine whether Parents are entitled to tuition reimbursement for E.G.'s education at BCA. This question, in turn, requires the Court to consider whether BCA could provide an appropriate education to E.G.

## A.  The alleged IDEA violations in this case are substantive in nature.

When reviewing an IDEA appeal, the court "reviews for both procedural and substantive violations." *L.H.*, 900 F.3d at 790. First, the Court considers whether the school complied with the procedural requirements of the IDEA. *Id.* (citation omitted). The IDEA's procedural requirements provide various rights to the parents of a disabled child, including a right to review any relevant documents related to their child, attend meetings, and obtain an independent educational evaluation of their child. 20 U.S.C. § 1415(b)(1). Parents must also receive written prior notice of proposed changes (or refusals to change) a child's placement or a provision of the child's FAPE. *Id.* § 1415(b)(3). The purpose of the IDEA's procedural safeguards is to ensure

"full parental involvement in the handicapped child's education." *Paul B.*, 88 F.3d at 1478

(quoting *Doe v. Alabama State Dept. of Educ.*, 915 F.2d 651, 660 (11th Cir. 1990)). Thus, "[a]n

important aspect in assessing procedural compliance is whether there was adequate parental

involvement and [meaningful] participation in formulating an IEP." *L.H.*, 900 F.3d at 790

(citations omitted).

In sum, a procedural violation usually involves the *preparation* of the IEP, "such as the

evaluation, placement, and IEP-formation procedures outlined in § 1414" of the IDEA. *Id.* at

789.  Accordingly, when considering whether any procedural violations occurred, the Court

looks "into 'the process by which the IEP is produced.'" *Id.* at 790 (quoting *Doe v. Defendant I*,

898 F.2d 1186, 1190 (6th Cir. 1990)).  On the other hand, substantive violations "concern the

*substance* of the IEP; namely, whether the school has provided 'an educational program

reasonably calculated to enable a child to make progress appropriate in light of the child's

circumstances.'" *Id.* (emphasis added) (quoting *Endrew F.*, 137 S.Ct. at 1001).

If an error is merely procedural in nature, the party challenging the IEP must also

demonstrate substantive harm. *See, e.g., Paul B.*, 88 F.3d at 1478; *Daugherty Jr. v. Hamilton

Cty. Sch.*, 21 F.Supp.2d 765, 772 (E.D. Tenn. 1998); 20 U.S.C. § 1415(f)(3)(E)(ii) (explaining

under what circumstances a hearing officer may find that a child did not receive FAPE as a result

of a procedural violation). The Sixth Circuit has summarized this additional requirement as

follows:

> [A] procedural violation of the IDEA is not a *per se* denial of a FAPE; rather, a
> school district's failure to comply with the procedural requirements of the Act will
> constitute a denial of a FAPE only if such violation causes substantive harm to the
> child or his parents. Substantive harm occurs when the procedural violations in
> question seriously infringe upon the parents' opportunity to participate in the IEP
> process. [In] addition, procedural violations that deprive an eligible student of an
> individualized education program or result in the loss of educational opportunity
> also will constitute a denial of a FAPE under the IDEA.

*Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 765–766 (6th Cir. 2001) (internal citations omitted).

In the present case, Defendant argues that any errors in the IEP "are procedural at best," [R. 15, p. 39], and the "alleged violations that the ECAB found in this case are certainly not substantive harms that seriously infringe on the Petitioner's rights." *Id.* at 41. To support this position, Defendant cites to an Eighth Circuit case, *Park Hill School District v. Dass*, 655 F.3d 762 (8th Cir. 2011). [R. 15, pp. 40-41] In that case, two administrative hearing panels found that the plaintiff school district failed to provide FAPE to a set of autistic twins. *Park Hill*, 655 F.3d at 763–64. The panels ultimately held that the parents were entitled to reimbursement because the IEPs at issue did not include any transition services or a behavior intervention plan for the twins. *Id.* at 766. The Eighth Circuit disagreed. It noted that the IDEA only requires transition services and a behavior intervention plan in limited circumstances. At the time that the IEPs were developed, such services and plans were not required for the twins. *Id.* at 766.

The Eighth Circuit then stated that "[t]he absence of IEP provisions addressing transition and behavior issues does not, standing alone, violate the IDEA or deprive the disabled child of a FAPE." *Id.* at 767 (citing *Lanthrop R-II School Dist. v. Gray*, 611 F.3d 418, 426 (8th Cir. 2010); *Lessard v. Wilton Lyndeborough Coop. Sch. Dist.*, 518 F.3d 18, 25–26 (1st Cir. 2008); *Sch. Bd. of Ind. Sch. Dist. No. 11 v. Renollett*, 440 F.3d 1007, 1011 (8th Cir. 2006)). This Court agrees that the absence of such provisions does not necessarily constitute a violation of the IDEA in every case. However, the Court takes issue with the Eighth Circuit's statement that "numerous cases confirm" that "the absence of these provisions in [the twins'] IEPs was at most a procedural, not a substantive error." *Id.* (citing *Fort Osage R-1 School Dist. v. Sims*, 641 F.3d 996, 1004 (8th Cir. 2011); *Gray*, 611 F.3d at 424; *Lessard*, 518 F.3d at 25–26; *Renollett*, 440

F.3d at 1011). The Court has reviewed the cases cited by the Eighth Circuit, but these cases do not support the broad proposition that the failure to include such provisions in an IEP is a procedural, rather than substantive, violation of the IDEA. The Court has also reviewed case law from other circuits and acknowledges that some other circuits suggest that inadequate transition planning is a procedural defect, *see, e.g.*, *Coleman v. Pottstown School Dist.*, 983 F.Supp.2d 543, 566 (3d Cir. 2013), but the Court is not aware of any Sixth Circuit precedent to that effect.

Relying on *Park Hill*, Defendant argues that "[t]he alleged violations that the ECAB found in this case are certainly not substantive harms that seriously infringe on Petitioner's rights." [R. 15, p. 41] This argument confuses the distinction between a procedural and substantive requirement. *Substantively*, the IEP must provide an "an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S.Ct. at 1001. *Procedurally*, the school district must comply with the procedural safeguards set forth in the IDEA, which are designed to ensure parents have a meaningful opportunity to participate in the development of the IEP. *See N.L. v. Knox County Schools*, 315 F.3d 688, 691 (6th Cir. 2003) (conducting certain meetings without parent present deprived parent of the right to participate); *Knable*, 238 F.3d at 765 (failing to convene IEP conference constituted procedural violation); *Paul B.*, 88 F.3d at 1478–79 (recognizing that the failure to provide adequate notice to parent would be a procedural violation warranting equitable relief). However, an IEP will only be invalidated on the basis of a procedural error if the parents demonstrate substantive harm. *See, e.g.*, *Knable*, 238 F.3d at 764 (citations omitted). The Sixth Circuit has recognized this distinction. *See e.g., id.* at 764–770 (discussing procedural violations, i.e., the failure to convene an IEP conference, then discussing substantive violations, i.e., the IEP's failure to provide an appropriate educational program).

In the present case, the ECAB concluded that there was denial of FAPE with respect to the IEP's lack of vocational training and because JCPS could not implement FAPE for E.G. The ECAB did not address any errors regarding the school district's compliance with the IDEA's procedural requirements or whether the parents were afforded a meaningful opportunity to participate in the IEP development process. Neither the School District nor the Parents present such issues in this case, and no such issues are before this Court.

In sum, the Court is not persuaded by the *Park Hill* case or Defendant's mischaracterization of the IDEA's procedural and substantive requirements. The alleged errors in this case were substantive in nature because they "concern the substance of the IEP; namely, whether the school has provided 'an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.'" *L.H.*, 900 F.3d at 790 (quoting *Endrew F.*, 137 S.Ct. at 1001). Further, even if the Court found that the alleged errors in this case were procedural and Parents were required to prove substantive harm, such harm is demonstrated by the fact that the school district failed to provide E.G. with FAPE, as explained below.

### B.  The July 21, 2017 IEP did not provide FAPE to E.G.

#### i.  Vocational Training and Transitional Needs

Under a section titled "Postsecondary Goal(s)," the IEP lists the following postsecondary goal related to E.G.'s education, training, and employment: "Upon completion of high school, [E.G.'s] goal is to complete employment skills training and on-the-job training provided through the Office of Vocational Rehabilitation" ("OVR") and "to be able to work in a supported employment position in his area of interest (2/21/17 music/dance, parts assembly)." [R. 14-7, p. 477 (emphasis in original)]  Under "Transition Service[s]" related to this goal, the following is

listed: "Parent permission required for release of information to OVR; Coursework leading to an Alternative [High School] Diploma; Community Based Instruction." *Id.* JCPS staff is listed as the "Agency Responsible" for these so-called transition services. *Id.*

The IEP also lists a postsecondary goal related to independent living: "Upon completion of high school, [E.G.'s] goal is to <u>participate in a supported living arrangement (2/21/17 with family) and perform daily living skills activities (e.g., personal shopping, meal preparation, chores) to the highest degree of independence possible</u>." *Id.* (emphasis in original). The transition services related to that goal are listed as: "Community Based Instruction; Daily Living Skills Instruction; Provide information to [E.G.'s] parents about guardianship, SSI, Michelle P Waiver, and Supported Living." *Id.* JCPS staff is listed as the "Agency Responsible" for these services. *Id.*

Under the section titled "Course of Study," the IEP lists "[p]roposed courses of study to assist the student in reaching measurable postsecondary goals." *Id.* at 478. For Grade 11, it lists, among various subjects such as English, math, and science, "Daily Living Skills." *Id.* For Grades, 12, 13, and 14,[8] it lists both "Daily Living Skills" and "Vocational Skills Instruction." *Id.*

The ECAB held that E.G. was denied FAPE because the School District did not appropriately plan for his vocational and transitional needs. [R. 1-3, p. 26] The ECAB acknowledged that the IEP "references vocational and/or transitional programming," but it held that the IEP "does not containing meaningful and appropriate vocational programming." *Id.* at 27. For example, the IEP "did not include specifics about when or where [E.G.] would

---

[8] The IDEA ensures that eligible children receive a free and appropriate public education between the ages of three and twenty-one. 20 U.S.C. § 1412(a)(1)(A). The July 21, 2017 IEP notes that "ARC discussed transition needs and projects [E.G.] to complete the course of studies through Grade 14 (age 21) leading to an Alternative High School Diploma." [R. 14-7, p. 477]

participate in vocational training" and "[t]here were no specific training requirements in [E.G.'s] goals or objectives."  The ECAB also explained that, "importantly, the IEP stated that 'Vocational Skills Instruction' is not available in Grade 11, but is only available from Grades 12 and beyond." *Id.*

The School District now argues that the IEP provided transition services "in a meaningful way in [E.G.'s] programming and that much of the detail of the instruction is coordinated by the classroom teacher at the school level." [R. 15, p. 21] The School District points specifically to Goal #6 on the IEP, which states that "[E.G.] will follow a task analysis to complete a variety of functional tasks to increase independence with at least 80% accuracy across 3 consecutive instructional sessions, as measured by teacher data probes." [R. 14-7, p. 483]  A benchmark/short-term objective for that goal provides, "Given a vocational task analysis and asked to complete, [E.G.] will finish the task with at least 80% independence across 3 consecutive [sic] as measured by teacher data probes and student work samples." *Id.* The IEP lists a similar benchmark for a "daily living skill with task analysis." *Id.* The School District also points to Goals #1 (related to money-handling skills) and Goal #2 (related to time-telling skills). *Id.* at 480. Within the list of "Specially Designated Instruction" for each goal, the IEP lists, among other things, "Community Based Instruction" to generalize these skills. *Id.*

The Court is not convinced that these provisions satisfy the IDEA's mandates with respect to vocational/transitional services. One of the express purposes of the IDEA is to allow students with disabilities to live independently. *See* 20 U.S.C. 1400(d)(1)(A). In support of this goal, the IDEA provides that, beginning when the child turns sixteen, an IEP must include "appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills,"

and the "transition services (including courses of study) needed to assist the child in reaching these goals." 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa)–(bb); *see also* 34 C.F.R. § 300.320(b). The IDEA defines "transition services" as

> a coordinated set of activities for a child with a disability that—
>
> (A) is designed to be within a results-oriented process, that is focused on improving the academic and functional achievement of the child with a disability to facilitate the child's movement from school to post-school activities, including post-secondary education, vocational education, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation;
>
> (B) is based on the individual child's needs, taking into account the child's strengths, preferences, and interests; and
>
> (C) includes instruction, related services, community experiences, the development of employment and other post-school adult living objectives, and, when appropriate, acquisition of daily living skills and functional vocational evaluation.

20 U.S.C. § 1401(34); *see also* 34 C.F.R. § 300.43(a).

The importance of these vocational and transitional services cannot be overstated. The United States District Court for the District of South Dakota has succinctly explained the importance of these services and Congress's intent in mandating such services:

> Transition services are "aimed at preparing students (soon to leave school) for employment, *postsecondary education,* vocational training, continuing and adult education, adult services, *independent living,* or community participation." H.R.Rep. No. 544, 101st Cong., 2nd Sess., at 9–10 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1723, 1732–1733 (emphasis added). Toward this end, Congress expects *schools* to develop "a coordinated set of activities for each student, based upon the student's needs and taking into account the student's preferences and interests." *Id.* at 1732–33 (emphasis added). The *schools* are required to "(a) consider the post-school outcomes desired for that student, and (b) provide educational and related services designed to prepare the student for achieving these outcomes." *Id.* (emphasis added). Congress took special care in drafting the statutory definition of transition services to include a requirement that the coordinated set of activities for a student must "promote[ ] movement from school to post-school activities," because Congress "expects schools to familiarize themselves with the post-school opportunities and services available for students with disabilities in their communities and State, and make use of this information in the transition planning for individual students." *Id.*

at 1733. Congress has squarely placed the "responsibility for developing and implementing interagency participation" on the administration of the school district, not upon the "already heavily-burdened teacher[,]" and Congress intends that other participating agencies will share responsibility with the schools for providing and funding a student's transition services. *Id.* at 1733–34.

*Yankton School Dist. v. Schramm*, 900 F.Supp. 1182, 1192 (D.S.D. 1995), affirmed as modified

by *Yankton School Dist. v. Schramm*, 93 F.3d 1369 (8th Cir. 1996).

The Sixth Circuit has also emphasized the IDEA's stated purpose "to ensure that all

children with disabilities have available to them a free appropriate public education that

emphasizes special education and related services designed to meet their unique needs *and*

*prepare them for employment and independent living.*" *Deal v. Hamilton Cnty. Bd. of Educ.*, 392

F.3d at 840, 864 (6th Cir. 2004) (quoting 20 U.S.C. § 1400(d)(1)(A) (emphasis added)) (internal

quotation marks omitted). "At the very least," the Sixth Circuit explained, "the intent of

Congress appears to have been to require a program providing a *meaningful* educational benefit

towards the goal of self-sufficiency, especially where self-sufficiency is a realistic goal for a

particular child." *Id.* (emphasis added).

Applying these principles to the case at hand, the Court finds that the July 21, 2017 IEP

fails to comply with the IDEA's mandate regarding vocational and transition services. At the

time that this IEP was developed, E.G. was sixteen years old. He was therefore entitled to an IEP

that listed "appropriate measurable postsecondary goals based upon age appropriate transition

assessments related to training, education, employment, and, where appropriate, independent

living skills," and the "transition services (including courses of study) needed to assist [E.G.] in

reaching these goals." 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa)–(bb).

The two postsecondary goals listed in E.G.'s IEP relate to his education, training, and

employment, as well as independent living. [R. 14-7, p. 477] They state his goals of completing

employment skills training and on-the-job training, and his goal of working in a supported

employment position. *Id.* They also state his goal of participating in a supported living

arrangement (probably with family) and performing daily living skills, like meal preparation and

chores. *Id.* Though not terribly detailed, these would appear to be appropriate and measurable

postsecondary goals related to E.G.'s training, education, employment and independent living

skills. *See* 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa).

However, the IEP must also include "transition services (including courses of study)

needed to assist [E.G.] in reaching these goals." *Id.* § 1414(d)(1)(A)(i)(VIII)(bb). The transition

services listed for each of the two postsecondary goals are vague, at best. They include

"Community Based Instruction" and "Daily Living Skills Instruction," but there are no details

about these specific services. [R. 14-7, p. 477] Further, to the extent the IEP provides for

"Vocational Skills Instruction" classes, it only provides that course for grades 12 and above. [R.

14-7, p. 478]

As noted above, schools are expected "to develop 'a coordinated set of activities for each

student, based upon the student's needs and taking into account the student's preferences and

interests.'" *Schramm*, 900 F.Supp. at 1192 (quoting H.R. Rep. No. 544, 101st Cong., 2nd Sess.,

at 9–10 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1723, 1732–33); *see also* 20 U.S.C.

§ 1401(34)(B). In this case, the IEP does not provide a coordinated set of activities related to

E.G.'s transitional services; at most, it provides that he will receive community based instruction

and daily living skills instruction (and eventually, vocational skills instruction), but with no

discussion of what this actually means in practice. Simply put, the transition services provided in

the IEP appear to be, at best, generic descriptions, not narrowly tailored to E.G.'s specific and

unique needs.

The School District argues that the details of E.G.'s vocational and transitional services will be worked out in the classroom. [R. 15, p. 21] However, the Court is mindful that "Congress has squarely placed the 'responsibility for developing and implementing interagency participation' on the administration of the school district, not upon the 'already heavily-burdened teacher.'" *Schramm*, 900 F.Supp. at 1192 (quoting H.R. Rep. No. 544, 101st Cong., 2nd Sess., at 9–10 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1723, 1733–34). The IDEA mandates that the IEP contain a plan for vocational/transitional services, and the School District failed to provide that in this case.

In sum, the Court has conducted an independent review of the record and has given due weight to the ECAB's decisions on this matter. Having done so, the Court holds that the July 21, 2017 IEP failed to satisfy the statutory mandate of the IDEA regarding vocational and transitional services, and in that respect, the School District failed to provide FAPE to E.G.

### ii. One-on-One Speech Services

The IEP describes the extent to which E.G. "will not participate in general education," specifically listing Speech Language, among other content areas. [R. 14-7, p. 487] The speech language services include thirty-minute speech/language therapy sessions, four times a week, with a speech language pathologist. *Id.* at 488. The IEP states, "Speech Language Services will be individual one to one as a prescribed related service through the first 9 weeks of school or to the first school based JCPS ARC meeting to discuss transition and progress." *Id.* at 487.

The Hearing Officer felt that the IEP "should not have limited the related one-on-one speech therapy to nine weeks" because E.G.'s "capabilities have not changed since March 2015 and it is not very likely that that will change within the first 9 weeks of school." [R. 1-2, p. 27] The ECAB expressed similar concerns, but it did not find that the School District denied FAPE

with respect to the speech services offered in the IEP. Rather, the ECAB stated that it held

"reservations about the school's intent and ability to implement the speech therapy." [R. 1-3, p.

32] It acknowledged the Hearing Officer's concerns that the speech therapy should not be limited

to nine weeks, but it "hestiat[ed] to find an IEP defective in its content because it provided for a

review after nine weeks." *Id.*  It explained, "Theoretically, the review could have resulted in a

conclusion that therapy should be continued. What gives pause is that speech therapy was

singled out for the review and nothing in the record suggests that the need for one-on-one

therapy would change." *Id.* at 32–33. The ECAB also shared the Parents' concern that the IEP

was written in such a way that one-on-one speech services were not guaranteed. *Id.* at 33.

Despite these concerns, the ECAB did not find the IEP defective with respect to the speech

services.

Perhaps because the ECAB did not find the IEP defective on these grounds, the School

District did not appeal on that issue. The Parents did not appeal this issue, either, or file a cross-

appeal in response to the School District's appeal. Rather, they raise this issue in their responsive

brief, in support of their argument that Anchorage denied E.G. FAPE. [R. 21, pp. 26–28]. In

response, Anchorage contends that the Parents are barred from raising this issue now.

However, given the way that the ECAB discussed one-on-one speech services, the Court

will not penalize the Parents for not appealing this specific issue. Importantly, the ECAB never

expressly stated that FAPE was (or was not) denied with respect to one-on-one speech services.

It does state that "it hesitat[ed] to find an IEP defective in its content because it provided for a

review after nine weeks." [R. 1-3, p. 32] Though this statement would suggest that the ECAB did

not find a denial of FAPE on these grounds, this discussion of speech services is subsumed

within the ECAB's holding that the School District denied FAPE because the IEP could not be

implemented at JCPS. Further, one of the ECAB panel members dissented on this issue, stating, "I respectfully dissent concerning the finding that the School violated FAPE regarding speech therapy." *Id.* at 38. Thus, though the ECAB never expressly found a denial of FAPE with respect to speech services, the Court can understand why the Parents may not have understood that they should appeal (or cross-appeal) on this issue.

Further, the Court does not find that FAPE was denied with respect to the one-on-one transition services. On this point, the Court shares the concerns of the ECAB—namely, that speech services at JCPS is a "sparse commodity" and it could not guarantee one-on-one speech services for E.G. [R 1-3, p. 33] However, as written, the IEP clearly states that E.G. will receive one-on-one speech therapy with a speech/language pathologist, four times a week, in thirty-minute sessions. [R. 14-7, p. 487–88] Had E.G.'s parents accepted his placement at JCPS and JCPS had failed to provide these services as outlined in the IEP, the Court might rule differently. Further, if after nine weeks, the School District had discontinued or otherwise limited E.G.'s speech services, the Court might rule differently. But the Court will not speculate as to what might have happened after the nine-week review.

In sum, the Court finds that the IEP, as written, adequately addresses one-on-one speech services for E.G. In other words, it was reasonable to provide one-on-one speech therapy with a speech/language pathologist, four times a week, in thirty-minute sessions. *See Endrew F.*, 137 S.Ct. at 999 ("Any review of an IEP must appreciate that the question is whether the IEP is *reasonable,* not whether the court regards it as ideal."). Accordingly, with respect to the one-on-one speech services, the IEP was "reasonably calculated to enable [E.G.] to make progress appropriate in light of the child's circumstances." *Id.* Regardless, as explained below, the Court

holds that JCPS could not implement the IEP and therefore, the School District denied FAPE to E.G.

### C.  Even if the July 21, 2017 IEP provided FAPE, JCPS could not implement the IEP and therefore could not provide FAPE to E.G.

In its March 8, 2019 decision, the ECAB held that there was a denial of FAPE because JCPS's physical setting prevented it from implementing the July 21, 2017 IEP. The ECAB first noted that "[t]he record is replete with evidence that [E.G.] requires very specific and consistent behavioral supports to maintain in a school or public setting." [R. 1-3, p. 27] The ECAB also noted that E.G. "has always been provided one-on-one instruction with extensive support services in a very small setting," but even in those controlled settings, "his advancement and behavioral maintenance has remained fragile." *Id.* at 28. The ECAB also found that "[i]f [E.G's] behavioral needs are not addressed, he cannot succeed academically," citing to his "significant sensory issues" and his maladaptive behaviors and aggressive outbursts." *Id.* To prevent these behaviors, "[c]onsistency and continuity are vital as mixed signals can lead to inadvertent reinforcement of negative behaviors." *Id.*

The ECAB then compared the services provided to E.G. at Anchorage School and BCA and the proposed services at JCPS. *Id.* at 29–32. For example, under a proposed placement at JCPS's Atherton High School,[9] E.G. would be placed in "crowded MSD classroom with a lot of desks," and "[t]he rooms were very small and the hallways were very narrow." *Id.* at 30. At least one student in the classroom "repeatedly screamed, something that could trigger aggression from" E.G. *Id.* at 31.  The ECAB also noted concerns with the Atherton High School's peer tutoring program, in which "peer tutors would further physically crowd the room and create

---

[9] The ECAB noted that the parties considered placement at Jeffersontown High School, Eastern High School, and Atherton High School, and Atherton High School was ultimately offered as the site for services. [R. 1-3, p. 30]

more noise which could result in [E.G.] acting out aggressively and interrupting his education."
*Id.* The ECAB ultimately held that JCPS could not implement the IEP, citing the schools' "large,
crowded" and "chaotic" classrooms, *id.* at 30–31; the physical layout of the schools, which
would be too loud and crowded for E.G., *id.* at 30; the use of inexperienced peer tutors, *id.* at 31;
and the ineffectiveness of E.G.'s noise-cancelling headphones in such a loud, crowded
environment, *id.* at 31.

The School District challenges the ECAB's decision on this point. Specifically, the
School District argues that "ECAB ignored the evidence that [E.G.] had flourished at his prior
public school, Anchorage Independent, and that the MSD classroom at JCPS would have been an
appropriate placement for [E.G.]." [R. 15, pp. 32–33] On this point, the School District cites to
E.G.'s activities at Anchorage School—including part-time general education and part-time
special education in an MSD classroom—to argue that "[E.G.] can make progress both
academically and behaviorally in environments with other students and in fact he was doing so
before his parents pulled him out of public school and placed him in a behavior clinic." *Id.* at 37–
38. The School District also argues that JCPS personnel, including a certified MSD teacher and a
speech/language pathologist, are qualified to implement the IEP, and it is not necessary to have a
board certified behavior analyst ("BCBA") on staff as requested by the Parents. *Id.* at 33–34.

First, the Court rejects the School District's argument that the ECAB "ignored the
evidence that [E.G.] had flourished" at Anchorage School. The ECAB carefully compared E.G.'s
classroom setting at Anchorage with the setting at BCA and JCPS.  The ECAB explained that, at
Anchorage, E.G. was educated "in a small, quiet facility with one-on-one instruction." [R. 1-3, p.
29] It went on to explain that the school had roughly 300–400 total students, with, at most,
thirteen students per classroom. *Id.* The ECAB explained that BCA has approximately twenty

students in a 7,500 square foot facility, and E.G. has a private cubicle with one-on-one assistance. *Id.* These findings are supported by the record.

Second, the Court takes issue with the School District's argument that the ECAB's "holding that a MSD classroom was inappropriate because it would be too noisy is . . . contradicted by the fact that E.G. attended a regular education school for eight years at Anchorage [School]." [R. 15, p. 6]  This argument mischaracterizes E.G.'s general education experience at Anchorage School.  There, E.G. had *some* involvement in the general education setting. *See, e.g.*, R. 14-7, p. 468. For example, he participated in electives with other general education students for about an hour each day. [R. 14-3, p. 35] He also received "some instruction" in science and social studies. *Id.* His teachers adapted the content of the general education settings to accommodate E.G., and he participated "about three times a week," during the 2014–2015 school year. [R. 14-7, p. 468] His teachers reported that E.G. "was gaining confidence and felt accepted by his peers," but also noted that he could become over stimulated, at which point he would "cover his ears and vocalize." *Id.* Though he could sometimes stay for the entire general education class, he only averaged about twenty to thirty minutes in class.  *Id.* True, he participated in the occasional school assembly and could sometimes walk independently between classes. [R. 14-3, p. 35; R. 14-7, p. 471] However, the record clearly demonstrates that E.G. needed special one-on-one instruction and any participation in the general education setting was limited.

Further, while it is true that E.G. may have progressed at Anchorage School, a public school, the evidence does not support the School District's argument that E.G. would flourish at JCPS. In fact, the evidence demonstrates that E.G.'s behavioral problems and learning deficits were so severe that placement at the JCPS schools would have significantly impaired his ability

to progress both academically and behaviorally. For example, if E.G. hears loud or unexpected noises (e.g., a dropped book or a slammed door), he may have an outburst or engage in maladaptive behaviors (e.g., scratching, grabbing eyeglasses, pushing over furniture). [R. 14-7, p. 472–73; R. 14-3, p. 22] Further, it is clear from the record that E.G. needs extensive support services, such as one-on-one speech and occupational therapy, and he benefits from one-on-one instruction and some small group instruction (with two to three other students). [R. 14-7, pp. 474, 488]  He needs a high level of structure to be successful, though "too much structure can be stressful to him and cause[] obsessive behaviors." *Id.* at 471; *see also* R. 14-3, p. 22.

The Court does not believe that, under the unique circumstances of this case, that these needs can be satisfied at JCPS.  First, the Court agrees with the ECAB's statement that the classroom placement at the proposed JCPS School, Atherton High School, would be too crowded and chaotic for E.G.  At that school, E.G. would have been placed in an MSD classroom.  E.G's mother testified about her concerns with a "typical MSD classroom," given the number of students, peer tutors, teachers, and assistants. [R. 14-2, p. 30]. All of these individuals are "compacted in a room and so . . . the environment . . . is significantly different than what E.G. has at BCA." *Id.*  In fact, the teacher in the MSD classroom described it as "squishy," meaning crowded. *Id.* at 32.  Elizabeth Lipe, BCA's program director, toured the JCPS classrooms and agreed that they could get "very crowded and very loud and not very comfortable for many learners, especially E.G." [R. 14-3, p 16]

Adding to the crowdedness and noise of the classrooms, two of the JCPS school sites (including Atherton) utilize peer tutoring programs. [R. 14-2, pp. 32, 80] Through those programs, roughly eighty to eighty-five high school students (i.e., seniors in good standing) would "[come] in and out all day long" to assist the special education teachers. *Id.* at 32. As the

ECAB pointed out, this is an "admirable program." [R. 1-3, p. 31]. However, for E.G., the presence of peer tutors only adds to the number of people in an already crowded classroom, and the additional people (and noise) could certainly trigger an outburst from E.G. [R. 14-2, p. 31]. E.G.'s mother also explained that the young peer tutors—even if not assigned to work with E.G.—could still inadvertently reinforce his negative behaviors.[10] *Id.* at 32.

E.G.'s private behavior analyst, Michael J. Keefe, provided testimony relevant to this issue. [R. 14-2, p. 77]. He agreed that BCA is a "very controlled environment," but even in that setting, E.G. would engage in aggressive behaviors, usually "correlat[ing] with some challenging stimuli in the environment." *Id.* For example, Keefe explained, another BCA student may start engaging in some of their own "challenging behaviors," and "those particular behaviors are sort of the antecedents that evoke instances of physical aggression for E.G." *Id.* Keefe acknowledged that, even in the "very controlled environment" at BCA, it was difficult to control E.G.'s aggressive behaviors. When asked what he would expect to happen if E.G. were placed in a less-controlled environment than BCA, he stated, "I would anticipate that those behaviors would be much more pervasive . . . just based off of E.G.'s history." *Id.*

When asked what his greatest concern was as far as E.G. being placed in one of the JCPS schools, Keefe explained that E.G.'s "progress is very fragile," and it does not take long for him to "unlearn something that he's learned previously" or "for a behavior to get intermittently reinforced or shaped back up after it's been decreased." *Id.* at 81. He expressed concerns that the staff members or a peer tutor, though well-meaning, could handle E.G.'s aggressive behaviors. *Id.* He summarized his concerns:

---

[10] The Court acknowledges that BCA also utilizes volunteers from a local high school; however, BCA only uses three volunteers, who come to BCA once a week. [R. 14-3, p. 8] Those volunteers do not interact with the students unless the BCA staff members feel it is appropriate. *Id.* There is no evidence suggesting that the BCA peer tutors interfere with E.G.'s education.

> So knowing where E.G. has come from and knowing what his behaviors have been
> in the past, to take him from an environment where he has been successful and
> transition him to an environment where I think there are significant concerns about
> whether the IEP can be implemented to an appropriate standard . . . those would be
> my biggest concerns.

*Id.* The Court finds this testimony of Keefe to be highly credible and persuasive, as Keefe is a

board certified and licensed behavior analyst who has worked with E.G. since approximately

2007. *Id.* at 66–67.

The July 21, 2017 IEP does list certain Supplementary Aids and Services for E.G.,

including "accommodations for high noise levels" and "noise cancelling headphones." [R. 14-7,

p. 485] However, the evidence suggests that these strategies will be inadequate or even

disruptive to E.G.'s education. For example, Lipe testified that E.G. wears noise-cancelling

headphones "even at BCA," where he has only three other students in the room (and one of those

students is not in the classroom often). [R. 14-3, p. 16] In her opinion, "if there are several small

groups happening at once, that is a lot of volume that's going to, I think, create difficulties [in]

comprehending information being presented to [E.G.] and then also a lot of distractions, and I

think that's going to result in frustration for him." *Id.*

E.G.'s mother also testified about the possibility that E.G. be removed from the

classroom and taken to a private room if he needed a break from the noise of the classroom. [R.

14-2, p. 32] However, E.G.'s mother explained that transferring E.G. to a private room could

reinforce his negative behaviors by indicating to him that he can avoid the classroom and avoid

work by acting out. *Id.* Further, E.G.'s mother held doubts as to whether the crowded school

could provide a private room and who would stay with E.G. in the room. *Id.*

In sum, the Court agrees with the ECAB's finding that placement in this setting would

have been detrimental to E.G. and would have triggered his aggressive outburst and maladaptive

behaviors, thereby interrupting his education. *See* R. 1-3, p. 31; *Endrew F. v. Douglas County School District RE 1*, 290 F. Supp. 3d 1175, 1184 (D. Colo. 2018) (applying on remand the standard articulated by Supreme Court in *Endrew F.* and concluding that school district's "inability to properly address Petitioner's behaviors . . . negatively impacted his ability to make progress on his educational and functional goals . . . [and] cuts against the reasonableness of" his IEP).

Having conducted an independent review of the record and giving due weight to the determinations made by the ECAB, the Court finds that, even if the July 21, 2017 FAPE provided FAPE to E.G., that IEP could not be implemented at JCPS. In other words, FAPE could not be provided at JCPS given E.G.'s unique behavioral issues and needs. Accordingly, the School District denied E.G. FAPE by insisting on the JCPS placement.

### D. Parents are entitled to full tuition reimbursement for the 2017–2018 school year.

The Supreme Court has recognized Congress's intent that, under the IDEA, school districts provide FAPE for disabled children, "either in the regular public schools or in private schools chosen jointly by school officials and parents." *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 12 (1993). However, "[i]n cases where cooperation fails . . . 'parents who disagree with the proposed IEP are faced with a choice: go along with the IEP to the detriment of their child if it turns out to be inappropriate or pay for what they consider to be the appropriate placement.'" *Id.* (quoting *Sch. Comm. of Town of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 370 (1985)). "For parents willing and able to make the latter choice, 'it would be an empty victory to have a court tell them several years later that they were right but that these expenditures could not in a proper case be reimbursed by the school officials.'" *Id.* (quoting *Burlington*, 471 U.S. at 370). Accordingly, the Supreme Court has held that "Congress meant to

include retroactive reimbursement to parents as an available remedy in a proper case." *Id.* (quoting *Burlington*, 471 U.S. at 370) (internal quotation marks omitted).

However, though a parent "may unilaterally remove the student from the public school, 'place the child in a private school[,] and seek reimbursement for the cost of the private school,' . . . they 'do so at their own financial risk.'" *L.H.*, 900 F.3d at 791 (quoting *Burlington*, 471 U.S. at 369–70, 373–74). The parents are entitled to reimbursement for the private school tuition only if the state agency (e.g., the ECAB) or a district court finds that "(1) the public school violated the IDEA and (2) the private school is appropriate under the IDEA." *Id.* (citing *Florence Cnty.*, 510 U.S. at 15); *see also Deal*, 392 F.3d at 866.

In this case, the Court has already found that the School District violated the IDEA by failing to provide FAPE to E.G. However, before considering whether BCA was an appropriate placement under the IDEA, the Court must address the parties' procedural arguments—namely, the Parents' argument that the School District has waived any challenge to the ECAB's tuition award and the School District's argument that the Parents failed to provide proper notice to the school and are therefore barred from receiving tuition reimbursement.

### i. The School District did not waive this argument.

Parents first argue that the School District failed to raise this specific issue on appeal to the ECAB, or in other words, they did not object to the Hearing Officer's ruling on this issue and they have therefore waived these arguments. [R. 21, pp. 41–42] In response, the School District argues that the Hearing Officer did not find that the BCA was an appropriate placement; rather, it found that JCPS could implement the IEP once corrected. [R. 23, p. 7] As a result, the School District argues that it had no reason to appeal that part of the Hearing Officer's decision, and it therefore did not waive its arguments on this issue. *Id.*

The Court agrees. On this issue, the Hearing Officer found that JCPS could implement the IEP once corrected. As a result, the Hearing Officer did not rule on whether BCA was an appropriate alternative placement for E.G. Simply put, the School District prevailed on the issue of whether JCPS could implement the IEP, and it therefore had no immediate reason to appeal that specific issue. *See M. v. Falmouth School Dept.*, 847 F.3d 19, 26 (1st Cir. 2017). Further, because the Hearing Officer did not rule that BCA was (or was not) an appropriate placement, there was no ruling on that issue to appeal. Accordingly, the Court finds that the Parents' waiver argument lacks merit, and the School District did not waive its arguments with respect to this issue.

### ii. The Parents are not barred from receiving tuition reimbursement for failure to provide adequate notice.

The School District argues that the Parents cannot be awarded tuition reimbursement because they failed to notify the School District of their reasons for declining the IEP, citing 20 U.S.C. § 1412(a)(10)(C)(iii)(I). That section of the IDEA governs the payment of a child's education when the child has been enrolled in a private school without the consent of or a referral by a public agency. *See id.* § 1412(a)(10)(C). It provides, in part,

> If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.

*Id.* § 1412(a)(10)(C)(ii). However, the cost of this reimbursement "may be reduced or denied" if:

> (aa) at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or

(bb) 10 business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the information described in item (aa);

*Id.* § 1412(a)(10)(C)(ii)(I)(aa)–(bb).

Citing to this provision, the School District argues that the Parents "are not entitled to reimbursement" because their July 24, 2017 email, in which they declined the IEP, "did not request reimbursement for private school tuition nor did not [sic] indicate the reasons for their denial of services." [R. 15, p. 54]. In that email, the parents stated only that they "decline[d] the offered services at Jefferson County Public School System." [R. 14-6, p. 162]

But the above-quoted provision does *not* mandate the denial of reimbursement when parents fail to provide the notice described in the statute. Rather, it states that reimbursement "*may* be *reduced* or *denied*." *Id.* § 1412(a)(10)(C)(ii) (emphasis added). Accordingly, the Court retains the discretion to either reduce or deny tuition reimbursement, but the IDEA does not compel the Court to do either. *See Schoenbach v. District of Columbia*, 309 F.Supp.2d 71, 85 (D.C. Cir. 2004) ("Courts *may* reduce or deny reimbursement—the text of the IDEA does not compel them to. . . . [T]he mere fact that parents violated the notice provision may not, in itself, justify reducing or denying tuition reimbursement.").

Further, the purpose of the statute is to "afford[] school districts the opportunity to address parental objections to a proposed IEP prior to the removal of a disabled child from public school." *Jefferson Cnty. School Dist. R-1 v. Elizabeth E.*, 702 F.3d 1227, 1241 (10th Cir. 2012) (citing *Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 523 (6th Cir. 2003)). In the present case, the parents repeatedly expressed their concerns with the various proposed IEPs, providing the school district with opportunities to address those concerns. *See Berger*, 348 F.3d at 524 (noting that parents signed the IEP indicating their agreement with the placement decision but intended

to enroll the child at a private school). This is evidenced by the numerous ARC meetings that took place in 2017 and the countless emails between the parents and school staff. The School District was also aware that the parents preferred BCA as a placement, as indicated by the parents' request that the Board approve such placement.

Though E.G.'s Parents may not have strictly complied with the notice provisions governing private placement, that failure alone does not justify reduction or denial of tuition reimbursement. Here, the School District was adequately informed of the parents' concerns and objections, was provided with numerous opportunities to address those concerns, and knew that the parents wanted E.G. to attend BCA. Under these circumstances, the Court does not find that either reduction or denial of tuition reimbursement is appropriate.

### iii.   BCA is an appropriate placement.

As noted above, the Court has already found that the School District violated the IDEA by failing to provide FAPE to E.G. but must now consider whether BCA was an appropriate placement under the IDEA. In other words, the Court must consider whether BCA "satisf[ies] the substantive IEP requirement, i.e., it must be 'reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.'" *L.H.*, 900 F.3d at 791 (quoting *Endrew F.*, 137 S.Ct. at 999). However, the "private school need not meet the full public school standards." *Id.* (citing 34 C.F.R. § 300.148; *C.B. v. Garden Grove Unified Sch. Dist.*, 635 F.3d 1155, 1159 (9th Cir. 2011)). Nevertheless, the Sixth Circuit has held that "a unilateral private placement does not satisfy the IDEA unless it, 'at a minimum, provide[s] some element of special education services in which the public school placement was deficient'; for example, specific special-education programs, speech or language therapy courses, or pre-tutoring services." *Id.* (quoting *Berger*, 348 F.3d at 523).

On this point, the ECAB held that BCA was an appropriate placement. It did not explain its decision in detail, however, stating only that "per the decision in the prior case [Agency Case No. 1516-17], BCA is an appropriate placement."[11] [R. 1-3, p. 37] The School District now argues that BCA is not an appropriate placement because it is more restrictive than JCPS (meaning E.G. spends less time in a regular classroom); it lacks certified teachers and does not provide occupational therapy; and E.G.'s behaviors have declined since he was first enrolled in BCA. [R. 15, pp. 42–47].

The Court finds that BCA was an appropriate placement. As noted above, the IEP could not be implemented at the JCPS schools due to their physical setting, which, given E.G.'s unique behavioral needs, would have been too crowded and distracting. BCA, on the other hand, has four student classrooms, each with four to six students.[12] [R. 14-3, p. 7] There are three other students in E.G.'s classroom, and one student is rarely in the classroom. *Id.* at 16. Each student has their own "designated area" or workspace, which is essentially a cubicle with short walls. *Id.* E.G. has his own cubicle, with his own individual desk. [R. 14-7, p. 475] At his desk are his personal reinforcers, which can be easily accessed by E.G. if needed. *Id.* This classroom layout is designed to provide every student a "home base" of sorts, i.e., a private workspace where they keep all of their materials and can stay focused. [R. 14-3, p. 7] In this way, BCA is clearly more appropriate for E.G. and his unique needs than the JCPS schools, as it provides a quiet, contained workspace for E.G., with limited distractions from other students, staff, or teachers.

BCA also provides a one-to-one student-to-adult ratio, ensuring one-on-one instruction throughout the day, unless a program specifically calls for group instruction. *Id.* at 8. The center

---

[11] The ECAB's decision in Agency Case No. 1516-17 held that, if JCPS could not implement the IEP at issue in that case, BCA would be an appropriate placement for E.G. [R. 8-1, pp. 12–19, 3:16-cv-804-TBR]

[12] The Court acknowledges that BCA is not a school, [R. 14-3, p. 18], though it refers to BCA learners as students.

also has a designated speech office, where the speech therapist can have private lessons with a student. *Id.* at 7. These one-on-one sessions are provided three times per week, for thirty minutes each session. *Id.* at 15. In addition, BCA staff includes board certified behavior analysts ("BCBAs") proficient in ABA techniques—a learning style that E.G. is familiar with and has progressed with. *See, e.g.*, *id.* at 5. There are two full-time BCBAs on cite at BCA, and a third BCBA splits her time between this BCA campus and another campus. *Id.*

BCA also provides significant vocational and transitional training to its students. The center is located in a shopping mall that also houses an exercise studio, a gym, a consignment store, a library, a doctor's office, two restaurants, a movie theater, a comic book store, a dentist office, a tax office, a dance studio, and a grocery store. [R. 14-3, p. 6]. BCA utilizes the grocery store, library, and consignment store "as training opportunities for [its] learners." *Id.* For example, the grocery store provides an opportunity for students to work on shopping skills, money skills, and appropriate community behavior (e.g., not talking to strangers). *Id.* BCA also coordinates with the consignment store and allows its students to go to the store, sort inventory, and put tags on clothes. *Id.* In the past, BCA also had a student that would help clean computers and shelve books at the library. *Id.* In other words, the students are provided with real-life scenarios in which to generalize the skills that they have learned. *Id.*

BCA also has a vocational office, as well as an apartment and a fully functioning kitchen. *Id.*; *see also* R. 14-7, p. 476. The vocational office has "various tools that [BCA's] job coaches will use with [the] learners for cutting wires and sorting electronics . . . before they take them to other outside places." [R. 14-3, p. 7]. The apartment is a "multifunctional space" where students can "work on some independent life skills like make a bed or folding clothes and putting them away appropriately." *Id.* at 7–8. The kitchen has everything the students need to cook, as well as

a washer and dryer so students can practice their laundry skills. *Id.* at 7. In these settings, E.G. practices daily living skills. [R. 14-7, p. 476]. The importance of developing these skills, including vocational skills, is outlined in E.G.'s IEP. *See, e.g.*, *id.*

The Court is not persuaded by any of the School District's arguments as to why it believes BCA is an inappropriate placement. The School District argues that BCA does not provide the least restrictive alternative available for E.G., because he could spend more time in a general education classroom if he were placed at JCPS. [R. 15, p. 43] The School District cites to the IDEA's requirement that an LEA "ensure that to the maximum extent appropriate, children with disabilities . . . are educated with children who are nondisabled." 707 KAR 1:350 (Section 1). However, as noted above, the private school is not required to satisfy the same IDEA standards as the public school. *L.H.*, 900 F.3d at 791 (citations omitted). The Court also notes that E.G. does not model from his peers, [R. 14-7, pp. 472–73], and placement in a general education setting may therefore be less beneficial to E.G. than to other disabled students. Further, while JCPS may have provided an opportunity for E.G. to participate in a general education setting, it could not otherwise implement the IEP, as explained above.

The School District also argues that BCA is inappropriate because it does not provide certified teachers or occupational therapists. Again, there is no requirement that the private entity be required to provide certified teachers or occupational therapy or to otherwise meet the public school standards in the IDEA. Instead, to be considered an appropriate placement, BCA must provide "some element of special education services in which the public school placement was deficient." *Id.* (citation omitted).

Further, the record suggests that E.G. is progressing at BCA and his behaviors are improving. *See, e.g.* R. 14-2, pp. 15–19; 14-3, pp. 10; 13–15; 24. For example, E.G.'s mother

testified that he was "doing really well" at BCA and his behaviors were improving. [R. 14-2, pp. 15–16] She also noted that he was making "tremendous progress in his reading comprehension," and his speech had also improved. *Id.* at 15–17. E.G.'s father also testified that E.G.'s experience at BCA has been "very impressive" and "very fulfilling." [R. 14-3, p. 24] Speaking about E.G.'s improved behaviors, his father described E.G. as "a little bit calmer," and he also noted that "[h]e can do more for himself." *Id.* Lipe also testified about E.G.'s improvements. When asked whether his physical stereotypy had progressed or regressed, she responded that "[i]t has definitely dramatically progressed." [R. 14-3, p. 13] She explained that E.G. had been engaging in physical stereotypy sometimes as much as seventy percent of the day, but it had improved to under ten percent "and mostly zero" percent. *Id.* She described this as "a very big improvement." *Id.*

In the present case, BCA provides a quiet classroom with only three other students and a private workspace, something that E.G. needs, but which JCPS could not provide. BCA also provides certified behavior analysts, one-on-one instruction, and significant vocational and transitional training. JCPS could not provide these special education services in a manner and forum that would allow E.G. to learn and progress. With these services, E.G.'s behaviors have improved, as has his independence and academic learning. For these reasons, the Court finds that BCA was an appropriate placement.

#### iv.   The equities weigh in favor of awarding tuition reimbursement.

As the Sixth Circuit has explained, upon finding an IDEA violation, the district court "is authorized to 'grant such relief as the court determines appropriate.'" *Deal*, 392 F.3d at 866 (quoting 20 U.S.C. § 1415(i)(2)(B)(iii)). In determining what relief is appropriate, "'[e]quitable considerations are relevant' . . . and the court enjoys 'broad discretion.'" *Id.* (quoting *Florence Cnty.*, 510 U.S. at 16) (internal quotation marks omitted); *see also Knable*, 238 F.3d at 771 ("[I]t

is the district court's role in the first instance to weigh the equities in this case to determine the appropriate level of reimbursement to be awarded." (citation omitted)). "Courts fashioning discretionary equitable relief under IDEA must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required. Total reimbursement will not be appropriate if the court determines that the cost of the private education was unreasonable." *Florence Cnty.*, 510 U.S. at 16.

Relying on the equitable nature of this relief, the School District argues that "[t]he equities in this case weigh against an award of reimbursement" for two reasons. [R. 15, p. 48]. First, "there had already been a due process hearing challenging the prior IEP, and the holding in that hearing was that Anchorage had provided Petitioner with FAPE by offering him an appropriate IEP and placement," and therefore the School District could not have foreseen that the same Hearing Officer would rule against it in the second due process hearing. *Id.* Second, the School District "convened no fewer than seven (7) ARC meetings which lasted hours and hours," so "[c]learly the district was doing everything within its power to ensure that it met the requirements of the IDEA." *Id.*

The Court is unpersuaded by these arguments. Both the Supreme Court and the Sixth Circuit have explained that tuition reimbursement is a proper remedy when the parents have demonstrated that their school district failed to provide FAPE and their unilateral decision to place their child in private school was proper. *Burlington*, 471 U.S. at 374; *Babb v. Knox Cnty. School System*, 965 F.2d 104, 109 (6th Cir. 1992); *see also Knable*, 238 F.3d at 770 (citing *Burlington*, 471 U.S. at 374; *Babb*, 965 F.2d at 109). The Supreme Court has also acknowledged that "Congress has imposed a significant financial burden on States and school districts that participate in the IDEA." *Florence Cnty.*, 510 U.S. at 15. However,

> public educational authorities who want to avoid reimbursing parents for the private education of a disabled child can do one of two things: give the child a free appropriate public education in a public setting, or place the child in an appropriate private setting of the State's choice. This is the IDEA's mandate, and school officials who conform to it need not worry about reimbursement claims.

*Id.*[13]

The fact that the School District did not expect the Hearing Officer to rule against them at the second due process hearing is immaterial. The School District's goal should always be to provide an educational program "reasonably calculated to enable [E.G.] to make progress appropriate in light of the child's circumstances," *Endrew F.*, 137 S.Ct. at 999, regardless of a hearing officer's prior decision (on a different IEP for a different school year) and regardless of how many ARC meetings are necessary to do so. If after seven ARC meetings and many hours of work, the School District still could not provide FAPE to E.G. in a public setting (and refused to place him in a private school), and the Parents' unilateral placement in BCA was appropriate, then they are entitled to tuition reimbursement. Though this remedy is equitable in nature, the Court, having considered all relevant factors, finds that the equities in this case weigh heavily in favor of a reimbursement award. As to the amount of that award, the Court notes that the School District does *not* argue that the cost of BCA was unreasonable, nor is there any evidence to that effect. Accordingly, the Court finds that the Parents should receive reimbursement for the total tuition paid to BCA for the school year outlined below.

---

[13] The School District boldly argues that there is "a philosophical disagreement as to whether E.G. is entitled to an education." [R. 23, p. 7] Clearly, however, the IDEA *mandates* that E.G. receive an appropriate education, and he is legally entitled to that education. On this point, the Court feels compelled to point out Congress's express finding that

> [d]isability is a natural part of the human experience *and in no way diminishes the right of individuals to participate in or contribute to society*. Improving educational results for children with disabilities is an essential element of our national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities.

20 U.S.C. § 1400(c)(1)(emphasis added); *see also id.* § 1400(d) (stating the purposes of the IDEA).

### v. Parents are entitled to tuition reimbursement for the 2017–2018 school year.

Having determined that tuition reimbursement is appropriate, the Court considers whether Parents are entitled to reimbursement for the 2017–2018 years only, or whether they may also be reimbursed for the 2018–2019 school year.

The ECAB held that the Parents were entitled to reimbursement for the 2017–2018 and 2018–2019 school years, but not for any prior years.  [R. 1-3, pp. 37] The School District argues that the Parents cannot recover for the 2018–2019 school year because the School District offered E.G. a different IEP for that year, and the parents have not challenged that IEP.[14] [R. 15, p. 47] The School District acknowledges that that IEP, dated July 20, 2018, was not developed until several months after the April 17–20, 2018 due process hearing in this case. *Id.* Because that IEP had not been drafted at the time of the 2018 due process hearing, Parents argue that they could not possibly have raised its deficiencies at the due process hearing. [R. 21, p. 43] They argue that "[t]he ECAB apparently foresaw Anchorage's argument and foreclosed it by finding that JCPS could not implement E.G.'s IEP 'regardless of any small fixes that might be made.'" *Id.* (quoting R. 1-3, p. 37). The Parents ask this Court to affirm the ECAB's award. *Id.* at 43–44.

The Court agrees that the Parents have failed to exhaust their administrative remedies with respect to the July 20, 2018 IEP. For this Court to award tuition reimbursement for the 2018–2019 school year, the Court would have to first find that the School District denied FAPE for that school year and that BCA was an appropriate placement. However, that IEP is not before the Court. In fact, to the extent it has been accepted by the Court as additional evidence, it is only for proof that the document exists.  [R. 26] To obtain judicial review of that IEP, the Parents

---

[14] That IEP, dated July 20, 2018 IEP, has been accepted by the Court as additional evidence but only for proof of the existence of the document [R. 26].

must first exhaust their administrative remedies under the IDEA or demonstrate that an exception

to exhaustion applies (e.g., that exhaustion is futile). *See Honig*, 484 U.S. at 326–27; *F.C. v.*

*Tennessee Dept. of Education*, 745 F. App'x 605, 608 (6th Cir. 2018). The burden of

demonstrating an exception rests on the party seeking to avoid the administrative process. *F.C.*,

745 F. App'x at 608 (citing *Covington v. Knox Cty. Sch. Sys.*, 2015 F.3d 912, 917 (6th Cir.

2000)).

   In the present case, the Parents have not exhausted their administrative remedies with

respect to the 2018 IEP, nor do they argue that any of the exhaustion exceptions apply. The

Court therefore finds that the Parents have failed to satisfy their burden of demonstrating such an

exception. The Court also notes that, under Kentucky law, the Parents can still file a due process

complaint regarding the July 2018 IEP. *See* 20 U.S.C. § 1415(f)(3)(C); KRS § 157.224(6).

Accordingly, while the Court finds it appropriate to award full tuition reimbursement for the

2017–2018 school year, the Court cannot award tuition reimbursement for the 2018–2019 school

year at this time.

## IV. CONCLUSION

   For the reasons set forth above, the Court **AFFRIMS IN PART** and **REVERSES IN**

**PART** the March 8, 2019 decision of the ECAB, [R. 1-3]. Accordingly, **IT IS HEREBY**

**ORDERED** as follows:

> 1. The March 8, 2019 ECAB decision [R. 1-3] is **AFFIRMED** to the extent it
>
>  finds a denial of FAPE with respect to vocational/transitional services; finds
>
>  denial of FAPE because JCPS could not implement the July 21, 2017 IEP; and
>
>  awards full tuition reimbursement for the 2017–2018 school year.

2.   The March 8, 2109 ECAB is **REVERSED** to the extent it awards full tuition reimbursement for the 2018–2019 school year.

3.   Parents may file a request for attorneys' fees and costs, including supporting authority, within **fourteen (14) days** of the entry of this opinion. Within **fourteen (14) days** of the filing of the Parents' request for attorneys' fees and costs, the School District may file a response. The matter will then stand submitted to the Court.

This the 3rd day of February, 2021.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY